In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-2827

THE ESTATE OF JASON THOMSON,

*Plaintiff-Appellant,*

*v.*

THOMAS BEHN, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 23-C-84 — **William C. Griesbach**, *Judge.*

ARGUED MAY 12, 2026 — DECIDED JULY 9, 2026

Before BRENNAN, *Chief Judge*, and KIRSCH and LEE, *Circuit Judges*.

KIRSCH, *Circuit Judge.* Jason Thomson was arrested at St. Vincent Hospital by officers from the Green Bay Police Department after behaving erratically and aggressively towards hospital staff. During his arrest and restraint, Thomson struggled against the officers. He also repeatedly stated that he couldn't breathe. Officers monitored Thomson's breathing and transported him to the Brown County Jail, where he ex-

perienced a cardiac arrhythmia and died. Thomson's Estate filed suit against the police officers under 42 U.S.C. § 1983, alleging excessive use of force and failure to provide medical care in violation of the Fourth Amendment, as well as a *Monell* failure-to-train claim against the City of Green Bay and Brown County. The district court granted summary judgment to the police officers, Green Bay, and Brown County. On appeal, the Estate challenges the dismissal of its claims against the police officers and Green Bay. Because no reasonable jury could find in the Estate's favor on the alleged constitutional violations and, in any event, the officers are entitled to qualified immunity, we affirm.

I

We recount the facts in the light most favorable to the Estate of Jason Thomson, the nonmoving party. *Argyropoulos v. City of Alton*, 539 F.3d 724, 727–28 (7th Cir. 2008). On the evening of February 9, 2020, Thomson suffered a seizure while at St. John's Homeless Shelter in Green Bay, Wisconsin. Emergency medical services transported Thomson to St. Vincent Hospital, where he received treatment. In the early morning hours of February 10, Thomson became agitated after accusing one of the nurses of rolling her eyes at him. Because Thomson was yelling and uncooperative, hospital staff called the Green Bay Police Department.

Video from the hospital, the squad car used to transport Thomson, and the Brown County Jail captured much of what happened next. Officer Michael O'Donnell was the first to respond. When he arrived at the hospital, Thomson was standing shirtless in a hallway, confronting hospital nurses and security officers. Thomson was flailing his arms and yelling incoherently. Officer O'Donnell approached Thomson from be-

hind and briefly followed Thomson down the hallway, placing himself between Thomson and hospital staff. Thomson turned to face Officer O'Donnell, who then grabbed Thomson's wrist and pushed Thomson against a wall. Thomson buckled backwards onto the floor, where Officer O'Donnell and hospital security officers struggled to restrain him. Officer Christopher Vaubel then arrived and began to assist, and the hospital security officers stepped away. At this point, Thomson was lying on his stomach and officers were on their knees attempting to restrain him as he continued to wriggle and flail. Officer Alex Wanish joined and eventually the three officers were able to handcuff Thomson. During this encounter, Thomson stated that he could not breathe and that he was going to die. In response, Officer O'Donnell placed his hand on Thomson's back to confirm that he was breathing, and Officers Vaubel and Wanish ensured that no one was impeding Thomson's breathing by putting pressure on his upper torso.

Within several minutes, Sergeant Thomas Behn and Officers Scott Delsart, Ben Harvarth, and Karen Pineda also arrived on the scene. Sergeant Behn assisted Officers O'Donnell, Vaubel, and Wanish in restraining Thomson, who continued to struggle, including kicking his legs. The officers therefore decided to place Thomson in a WRAP device, which immobilizes an individual's lower body in a fabric case, to prevent him from injuring himself or others. As Officers Vaubel, Delsart, Wanish, and Sergeant Behn applied the WRAP, Thomson continued to say that he couldn't breathe. Sergeant Behn monitored Thomson and observed that he was breathing and that none of the officers was applying pressure that might restrict his breathing. The officers placed a loosely secured foam helmet onto Thomson's head and then carried

him, restrained in the WRAP, out of the hospital and into a squad car for transport to the Brown County Jail.

Throughout Thomson's arrest and restraint, the officers observed his physical symptoms, including his labored breathing, sweating, foaming at the mouth, gibberish, and abnormal strength. The police department's policy manual identifies some of these symptoms as potential signs of "increased risk of sudden death" and states that "[c]alls involving these persons should be considered medical emergencies." Department policy also states that if a subject restrained in the WRAP "complains of or shows signs of breathing distress," "medical attention should be provided immediately," and that arrestees that claim injury should be medically cleared prior to booking.

Before Thomson's departure from the hospital, Sergeant Behn filled out a medical clearance form and submitted it to hospital staff for completion. That form stated that Thomson had been treated for a seizure and had fought with the officers. The bottom portion, labeled "Provider Medical Stability Exam" and completed by hospital staff, had a checkmark next to the box stating: "Patient Uncooperative. To the best of my knowledge a medical emergency does not exist." That portion was signed by the attending physician in the hospital's emergency room.

Officers Harvath and Pineda drove Thomson to the jail, with Officer Vaubel accompanying them in a separate vehicle. When Thomson was placed in the car, Officer Wanish turned the foam helmet around so that its back side covered Thomson's face. It's not clear from the footage whether this was intentional. During the roughly ten-minute drive to the jail, Thomson maneuvered the foam helmet to uncover his nose

and mouth. He eventually removed the helmet completely. Thomson also repeated his complaints that he couldn't breathe. In response, Officer Harvath asked Thomson what was wrong with his breathing. Thomson responded that he would explain once the officers removed the WRAP. The officers continued to the jail without removing the WRAP or seeking medical attention.

Thomson arrived at the jail around 3:10 am. By that time, he was pale, largely unresponsive, and had to be carried from the car. Officers Harvath, Pineda, and Vaubel met jail officers, who asked the jail's Health Service Unit to assess Thomson. Nurse Rebecca Warren arrived around 3:15 am and saw that Thomson was pale, drooling, and unable to communicate coherently. She took Thomson's pulse and respirations but couldn't take his blood pressure. Based on her observations, Nurse Warren concluded that Thomson could not be admitted to the jail and instead needed to go to a hospital for reevaluation.

Jail officers carried Thomson—still confined in the WRAP—back to the squad car, where Thomson's condition deteriorated. Approximately five minutes later, Officers Harvath and Pineda moved him to the floor of the jail's sally port, removed the WRAP, and began CPR. Paramedics then arrived on the scene, attempted to resuscitate Thomson, and eventually transported him to a hospital, where he was pronounced dead. The medical examiner determined that the cause of death was "[c]ardiac arrhythmia of undetermined etiology following police restraint" and ruled the manner of death a homicide.

Thomson's Estate sued the Green Bay Police Department and Brown County officers involved and Nurse Warren under

42 U.S.C. § 1983, alleging that the officers used excessive force and that all defendants failed to provide adequate medical care in violation of the Fourth Amendment. The Estate also asserted a *Monell* failure-to-train claim against the City of Green Bay and Brown County. The defendants moved for summary judgment.

The district court granted the defendants' motions except as to Nurse Warren. The court found that the officers did not use excessive force when they arrested Thomson or when they placed him in the WRAP. Similarly, the court found that the officers did not violate Thomson's right to adequate medical care at any point during the evening in question. And even if the Estate could establish a Fourth Amendment violation based on a failure to provide adequate medical care, the court determined that the officers were entitled to qualified immunity. Finally, because the Estate couldn't establish an underlying constitutional violation, the district court dismissed the *Monell* failure-to-train claim against Green Bay and Brown County.

Following the district court's summary judgment decision, Nurse Warren was dismissed from the case pursuant to a stipulation by the parties. Similarly, the parties resolved all claims against Brown County and the County officers. The only remaining claims are therefore against Green Bay and the officers from the Green Bay Police Department.

## II

On appeal, the Estate challenges the dismissal of its medical care and excessive use of force claims against Officers O'Donnell, Wanish, Delsart, Vaubel, Harvath, Pineda, and Sergeant Behn and its *Monell* failure-to-train claim against

Green Bay. We review the district court's ruling de novo, construing all facts and reasonable inferences in favor of the non-moving party. *Argyropoulos*, 539 F.3d at 732. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## A

### 1

We begin with the Estate's assertion that the Green Bay police officers violated Thomson's constitutional right to adequate medical care at three junctures: at the hospital, in the squad car, and at the jail. In evaluating each of these claims, we ask whether the officers' conduct was objectively unreasonable under the circumstances, based on what they knew at the time. *Braun v. Village of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022) (citation modified). That inquiry considers: (i) whether the officers had notice of the detainee's medical needs; (ii) the seriousness of the medical need; (iii) the scope of the requested treatment; and (iv) police interests, including administrative, penological, or investigative concerns. *Id.* (citation modified). Because we conclude that no reasonable jury could find that the officers violated Thomson's right to adequate medical care, summary judgment in the officers' favor was appropriate.

The Estate first argues that Officers O'Donnell, Vaubel, Delsart, Wanish, and Sergeant Behn's failure to seek medical care at the hospital was unreasonable. Officers can be placed on notice of a medical need by word or through observation of physical symptoms. *Id.* The officers who participated in Thomson's arrest observed his physical state, including his

heavy breathing and sweating. Like the district court, we also presume that they had verbal notice of his medical need, because Thomson told the officers that he could not breathe and that he was going to die. And it's undisputed that an inability to breathe is a serious medical condition. See *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (observing that asthma, depending on degree, can be a serious medical condition). Finally, the officers don't contend that seeking medical care for Thomson at the hospital would have been onerous, nor do they assert a police interest beyond expeditiously removing him.

The Estate therefore argues that the officers' failure to seek medical attention violated Thomson's right to adequate medical care. But our "ultimate inquiry" is the reasonableness of their conduct. *Est. of Perry v. Wenzel*, 872 F.3d 439, 453–54 (7th Cir. 2017). Based on what the officers knew at the time and under the circumstances, no reasonable jury could find their conduct objectively unreasonable. When Officer O'Donnell first encountered Thomson in the hospital hallway, Thomson was combative and did not show signs of a serious physical health condition. Officer O'Donnell proceeded to try to handcuff Thomson, at which point Thomson began to struggle and, eventually, to say that he couldn't breathe. In response to Thomson's complaints, Officer O'Donnell placed his hand on Thomson's back to confirm that he was breathing. And when the other officers joined to assist Officer O'Donnell, they jointly ensured that nobody was kneeling on Thomson or restricting his airflow. Though the officers stopped short of seeking medical care, that was not objectively unreasonable because—although Thomson stated that he couldn't breathe—they monitored him, confirmed that he was breath-

ing, and took steps to ensure that they weren't inhibiting his breathing.

The officers' precautionary measures distinguish this case from *Perry*, 872 F.3d 439, on which the Estate relies. In *Perry*, the defendants didn't obtain medical care "or take any other actions" even though they knew that the arrestee had suffered seizures, had defecated and urinated on himself, and had begun to spit or drool on his lap. *Id.* at 455. Under the circumstances, we found their decision to ignore the arrestee's complaints and do nothing unreasonable. *Id.* Here, conversely, the officers addressed Thomson's complaints and actively monitored his condition.

The Estate's other arguments, including its attempt to raise disputes of material fact, are unpersuasive. The Estate's primary contention is that Thomson's heavy breathing, sweating, and other physical symptoms were signs that he was experiencing a medical emergency. But such symptoms were also consistent with Thomson's prolonged physical struggle against the officers, which is how they interpreted them. Though a similar factual dispute—whether a detainee was experiencing a medical emergency or being combative— precluded summary judgment in *Perry*, see *id.*, that's not the case here. Thomson's physical symptoms may have been ambiguous, but once he stated that he couldn't breathe, the officers took concrete steps to address that concern. Their conduct was therefore objectively reasonable, even if they misinterpreted Thomson's physical symptoms. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

The other factual disputes and inferences that the Estate raises are similarly uncompelling. Even when we construe these facts and inferences in the Estate's favor (i.e., that hospital staff didn't evaluate Thomson during his arrest and that the medical clearance form didn't address Thomson's breathing issues), our analysis remains the same. Finally, the Estate makes much of the officers' failure to follow departmental policy, which directs them to seek medical attention if an arrestee claims injury or breathing distress. But an officer's compliance with departmental policy "is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirement." *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017). Though those policies can be relevant, our analysis is "governed by constitutional principles," which we find satisfied here. *Id.* at 536–37.

The Estate next challenges Officers Harvath and Pineda's failure to seek medical attention for Thomson while transporting him from the hospital to the jail. That claim fails, too. Because Thomson continued to say that he couldn't breathe, Officer Harvath asked Thomson what was wrong with his breathing. Thomson responded that he would explain after the WRAP was removed, not that he was in distress. Furthermore, Officer Harvath continued to monitor Thomson's breathing and believed that any known medical issue would have been addressed as a part of Thomson's medical clearance before leaving the hospital. Though the Estate argues that the clearance form didn't cover Thomson's breathing issues, it does not identify any facts making it unreasonable for Officer Harvath to have relied on the form during transport. And both officers knew that—if necessary—Thomson could get medical treatment at the jail, which was less than ten minutes away. Based on these facts, no reasonable jury could

find that the officers' failure to seek medical care during transport was objectively unreasonable.

Finally, we reject the Estate's contention that Officers Harvath, Pineda, and Vaubel, who were present at the jail, violated Thomson's right to adequate medical care. It's undisputed that the officers and jail staff were on notice that something was seriously wrong with Thomson once he arrived; he was unresponsive, pale, and had to be carried from the squad car. The jail staff therefore sought medical attention from the Health Services Unit, and Nurse Warren arrived shortly thereafter. It's well-established that non-medical officers may rely on the professional judgment of medical professionals without exposing themselves to liability under § 1983. *Perry*, 872 F.3d at 458. So once Nurse Warren was present, the officers were entitled to defer to her professional medical judgment. *McGee v. Parsano*, 55 F.4th 563, 569, 573 (7th Cir. 2022).

An exception to that deference exists when non-medical officers have reason to know that the medical professionals are "failing to treat or inadequately treating" an individual. *Id.* at 569. But that exception doesn't apply here. The Estate points to the obviousness of Thomson's deteriorating health, but that "has minimal relevance under our caselaw." *Id.* at 574. Rather, the question is whether the officers had reason to believe that Nurse Warren mistreated or failed to treat Thomson, and the Estate doesn't identify any evidence suggesting that's the case. See *id.* To the extent that deterioration in condition is relevant, we've found officers entitled to defer to medical staff in circumstances far more obvious than this one, such as when an individual experienced "severe shaking and foaming at the mouth." *Id.* (comparing those symptoms to the

"more subtle" symptoms of "lethargy, incoherence, and la-bored breathing").

The Estate also suggests that the officers weren't entitled to rely on Nurse Warren's medical judgment because they failed to inform her about Thomson's breathing complaints. But the Estate cites no cases suggesting that this failure to re-lay information affects the officers' ability to rely on Nurse Warren's professional judgment. And, in any event, it was clear—even without such reports—that Thomson had a seri-ous medical need once he was at the jail. To the extent that the Estate tries to repackage its argument into a claim of deliber-ate indifference, that too fails. Once Thomson arrived at the jail, the officers knew that he was in poor condition and—within five minutes—a medical professional was present to assess him. The Estate therefore can't show that the officers "failed to act despite [their] knowledge of a substantial risk of serious harm." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003) (citation modified).

2

Even if the Estate could establish that the officers violated Thomson's right to adequate medical care, dismissal of those claims was appropriate because the officers are entitled to qualified immunity. We review an officer's entitlement to qualified immunity de novo, asking whether the right at issue was clearly established at the time and under the circum-stances presented. *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015). The Estate can show that a right was clearly estab-lished by identifying "a clearly analogous case establishing the right to be free from the conduct at issue" or by showing that the officers' conduct "was so egregious that no reasona-ble person could have believed that it would not violate es-

tablished rights." *Id.* at 508–09 (citation modified). The Estate bears the burden of defeating the officers' immunity defense. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). It cannot carry that burden.

The right at issue is not, as the Estate asserts, an arrestee's general right to adequate medical care. Rather, it is the right to medical care "in light of the specific context of the case." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasizing that clearly established law must not be defined at a high level of generality, especially in the Fourth Amendment context). The Estate fails to identify any case establishing that officers violate the Fourth Amendment by failing to seek medical treatment when the arrestee's potential medical condition (here, trouble breathing) could be consistent with mere physical exertion, the officers observe that the arrestee is breathing, and they take steps to ensure that they aren't inhibiting his breathing. As already discussed, the Estate's reliance on *Perry* is misplaced; unlike in that case, the officers took cautionary measures in response to Thomson's complaints. See *Perry*, 872 F.3d at 460 (finding "the failure to take *any* action in light of a serious medical need" clearly established as objectively unreasonable). And the Estate doesn't point to any case showing that the officers' conduct at the hospital was so egregious that any reasonable person would find it a constitutional violation. See *Beaman*, 776 F.3d at 508.

We similarly conclude that Officers Harvath and Pineda, who transported Thomson, and the officers present at the jail are entitled to qualified immunity. The Estate doesn't identify any cases clearly establishing that failure to seek medical treatment during transport is objectively unreasonable when the arrestee has been medically cleared by a doctor, the offic-

ers ask about his condition, and treatment is available within
ten minutes. Nor do they identify cases clearly establishing
that it was objectively unreasonable for the officers at the jail
to not seek more or better treatment for Thomson than what
was provided by Nurse Warren. Therefore, because the Estate
cannot prove a violation and because—in any event—the of-
ficers are entitled to qualified immunity, the district court's
grant of summary judgment in their favor was appropriate.

## B

### 1

Next, we consider the Estate's claims that the officers used
excessive force in arresting Thomson and by placing him in
the WRAP. We analyze these claims under the Fourth
Amendment's objective reasonableness standard, consider-
ing "the specific circumstances of the arrest, including the se-
verity of the crime at issue, whether the suspect poses an im-
mediate threat to the safety of the officers or others, and
whether he is actively resisting arrest or attempting to evade
arrest by flight." *Avina v. Bohlen*, 882 F.3d 674, 678 (7th Cir.
2018) (citation modified). And we adopt "the perspective of a
reasonable officer under the circumstances, rather than exam-
ining the officer's actions in hindsight." *Id.* (citation modi-
fied).

The Estate contends that Officer O'Donnell used excessive
force in arresting Thomson and that material factual disputes
preclude summary judgment. Not so. When Officer O'Don-
nell arrived at the hospital, staff members were trying to cor-
ral Thomson, who was yelling and uncooperative. Officer
O'Donnell states that he grabbed Thomson's wrist because
Thomson approached him in an aggressive manner, which

the Estate disputes. Even if that's not what happened, it wasn't objectively unreasonable for Officer O'Donnell to grab Thomson's wrist in light of Thomson's volatile behavior and confrontation with hospital staff.

As Thomson struggled, Officer O'Donnell then pinned him to the wall, took him to the ground, and held him down while trying to handcuff him. That wasn't unreasonable, either. See *Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021) (finding the practice of taking a resisting subject to the ground a "routine police activity"). Because Thomson wasn't complying, Officer O'Donnell (and later, the officers assisting him) were entitled to use more force to subdue Thomson. See *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) ("Authorities must be allowed to graduate their response to the demands of any particular situation.").

We also find that Officers Vaubel, Wanish, Delsart, Harvath, Pineda, and Sergeant Behn didn't use excessive force when they decided to further restrain Thomson with the WRAP. Even after being handcuffed, Thomson continued to kick and flail, creating a safety risk to himself and to the officers. It therefore wasn't excessive force for them to use the WRAP, which is designed for the restraint and transportation of violent or combative subjects.

The Estate disputes that Thomson resisted as Officer O'Donnell initially attempted to arrest him. But it's not enough for the Estate to merely deny that Thomson resisted; it must point to admissible evidence in the record. *Marvin v. Holcomb*, 72 F.4th 828, 833 (7th Cir. 2023). Here, the testimony of Officer O'Donnell and those on the scene—including hospital staff who intervened to help Officer O'Donnell until other officers arrived—confirms that (at least at the beginning

of the encounter) Thomson was physically resisting. Video from the hospital doesn't show otherwise.

The Estate also insists that Thomson's struggle against the officers after being handcuffed was an attempt to breathe, not resistance. It's true that, from the video alone, it's not possible to tell why Thomson is struggling. But, as with the Estate's medical care claims, this factual dispute isn't material because it doesn't affect the outcome of the reasonableness analysis. See *Anderson*, 477 U.S. at 248. It's undisputed that Thomson was unruly and uncooperative when Officer O'Donnell first encountered him in the hallway. Even if Thomson's struggle against the officers transitioned at some point from resistance to an attempt to breathe, we allow for the fact that officers face "tense, uncertain, and rapidly evolving" circumstances when determining reasonableness. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Moreover, Officer O'Donnell and the other officers took measures to ensure that Thomson was getting enough oxygen, even as they used force to subdue and restrain him. Their use of force during the arrest and in applying the WRAP, in light of these circumstances, wasn't objectively unreasonable. See *Phillips*, 123 F.3d at 593.

Finally, the Estate argues that Officer Wanish used excessive force when he twisted the WRAP helmet over Thomson's face, covering his nose and mouth, while Thomson was in the back of the squad car. Because the Estate makes this argument for the first time on appeal, it is waived and we do not consider it. See *Oates v. Discovery Zone*, 116 F.3d 1161, 1168 (7th Cir. 1997) (finding it axiomatic that arguments not raised below are waived); *United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) ("[T]he waiver doctrine is designed for our

own protection as much as that of an opposing party, and therefore need not be asserted by a party for us to invoke it.").

2

Even if the Estate could establish that the officers used objectively unreasonable force, the officers would be entitled to qualified immunity. To overcome qualified immunity for an excessive force claim, the Estate must: (i) identify a closely analogous case establishing a right to be free from the type of force used or (ii) show that the force "was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment." *Cibulka*, 992 F.3d at 639 (citation modified).

The Estate can't do either. The cases it points to state only that officers may not use excessive force and that minimal force should be used when an arrestee is passively resisting. See *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007) (finding it clearly established that a police officer may not use excessive force); *Becker v. Elfreich*, 821 F.3d 920, 928–29 (7th Cir. 2016) (finding it clearly established that "only minimal force is warranted where the accused is passively resisting"). Neither applies here. Thomson's behavior wasn't passive and, in any event, the officers' force wasn't excessive. The Estate does not attempt to identify a more factually analogous case, nor does it raise any factual disputes impacting the qualified immunity analysis. Though the district court didn't address qualified immunity for the excessive force claims, we also affirm on this ground. See *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 558 (7th Cir. 2019) ("We may affirm the grant of summary judgment on any ground supported by the record, as long as the parties adequately presented the issue

before the district court and the nonmoving party had an opportunity to contest it.").

C

Finally, we consider the district court's dismissal of the Estate's *Monell* failure-to-train claim against Green Bay. Because the Estate fails to establish an underlying constitutional violation, Green Bay cannot be held liable under *Monell*. *Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010).

AFFIRMED